IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division

| | |
|---|---|
| Christopher Lee,<br><br>Plaintiff,<br><br>v.<br><br>Town of Mooresville, North Carolina;<br>Chief Ron Campurciani, in his official and individual<br>capacities; Tracey Jerome, in her official and<br>individual capacities; Chris Carney, in his individual<br>capacity; and Chris Quinn, in his individual capacity;<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CASE NO.: _____ |

## **COMPLAINT AND JURY DEMAND**

### **Introduction**

1. This is a civil rights and whistleblower-retaliation action arising from the termination of the Town of Mooresville's Director of Innovation and Technology after he refused to participate in the suppression, concealment, misclassification, restriction of access to, or manipulation of municipal electronic records and evidence documenting serious misconduct by the Town's Mayor and implicating senior municipal leadership.

2. Plaintiff Christopher Lee was not terminated for poor performance, insubordination, or any legitimate operational deficiency. Instead, after being identified for termination and placed under escalating pressure, he resigned because he insisted that politically sensitive electronic evidence be preserved and handled in accordance with Town policy and lawful process, and because he refused to convert the Town's information systems into instruments of concealment.

3. Plaintiff's protected activity was specific, immediate, and tied to a concrete public concern: whether the Town's senior leadership would preserve and lawfully classify electronic evidence documenting a security incident inside Town Hall involving the sitting Mayor; whether Town officials would truthfully account for the existence and handling of that evidence when confronted with public-records requests, subpoenas, litigation holds, and investigative demands; and whether municipal electronic systems would be used to protect the public interest or protect political power.

4. As Director of Innovation and Technology, Plaintiff was the lawful custodian and senior administrator of the Town's core digital environment, including municipal servers and storage architecture, network infrastructure, identity and credential management, electronic access-control and swipe-card systems, alarm and motion-detection systems, backup repositories, audit-logging systems, retention schedules, and Town Hall closed-circuit television ("CCTV") surveillance platforms.

5. Plaintiff possessed unique authority and responsibility over how surveillance footage and electronic records were stored, accessed, exported, logged, retained, and preserved. In practical terms, Plaintiff's position controlled whether critical evidence remained intact and retrievable; whether export and audit functions remained enabled; whether retention rules were followed; and whether "technical decisions" were used as a pretext to make evidence difficult to access, easy to overwrite, or effectively unrecoverable.

6. On or about October 10, 2024, Town surveillance cameras, access-control systems, and alarm sensors captured Defendant Chris Carney, the sitting Mayor of Mooresville, entering Town Hall after midnight accompanied by Jaime Gatton, an adult woman who, upon information and belief, was not authorized to be present in the building after hours under

Town security policies and established after-hours access practices, including secured-building protocols and alarm-response procedures.

7. The Town's electronic systems recorded credentialed entry by the Mayor, multiple overnight interior motion-detection activations, alarm-monitoring events, and a law-enforcement response. The Town's CCTV system simultaneously recorded the Mayor's movements inside the building during the same overnight timeframe.

8. The footage and related electronic artifacts constitute official municipal records created and maintained by Town systems in the ordinary course of municipal operations. They document a security event inside a government facility, activation of alarm protocols, and a law-enforcement response. They are not personal property, personal keepsakes, or "optional" records.

9. Plaintiff personally viewed the Town Hall CCTV footage of the incident. The footage shows Mayor Carney and the accompanying woman moving through Town Hall hallways and interior spaces, and it further shows Mayor Carney in a state of partial or complete undress, with his genitalia exposed and his penis visibly erect while inside Town Hall. The footage is inconsistent with the Mayor's public explanation that the incident involved vomiting and instead depicts nudity and sexual arousal, rendering the footage uniquely sensitive and politically explosive for Town leadership.

10. The existence of such content transformed the incident from a routine facilities or security matter into a severe reputational, political, and institutional threat. It also increased the stakes for any public-records request, civil litigation, ethics inquiry, or criminal investigation touching Town Hall security, access-control, alarms, dispatch, or surveillance systems.

11. Senior Town officials, including Town Manager Tracey Jerome, Police Chief Ron Campurciani, and Town Attorney Sharon Crawford, became aware of the existence and

nature of the CCTV footage and associated electronic logs. As described below, those officials reviewed the footage and/or received detailed briefings regarding its contents. Despite the corroborating electronic evidence, no meaningful independent investigation was initiated, no transparent ethics inquiry was undertaken, and no referral to an outside agency was pursued in a manner consistent with the seriousness of the event and the integrity needs of Town governance.

12. Instead, the incident was minimized and internally reframed, including by labeling the event a "false alarm" or its equivalent, notwithstanding electronic evidence reflecting credentialed entry, interior motion activity, alarm events, a law-enforcement response, and preserved video footage.

13. After the incident was flagged in the course of Plaintiff's custodial duties, Plaintiff reviewed the Town Hall CCTV footage and related electronic records and immediately elevated the matter to senior Town leadership.

14. Plaintiff notified Town Manager Tracey Jerome and Town Attorney Sharon Crawford and met with Jerome and Crawford to disclose the existence of the footage and present it for review.

15. Later that same night, Plaintiff attended a further meeting with Jerome, Crawford, Police Chief Ron Campurciani, and other senior Town personnel, during which the group reviewed the footage together and discussed the incident and the Town's response.

16. Plaintiff became aware that the footage and logs existed; that senior officials knew they existed; and that Town leadership was actively attempting to control the narrative, control access, and reduce the likelihood that an auditable trail would reveal who viewed, exported, copied, classified, or handled the footage and related records.

17. Plaintiff further understood that the footage and related logs were official municipal records and potential evidence subject to preservation obligations, including litigation holds, retention requirements, and production through lawful process. Plaintiff also understood that deliberate efforts to conceal, misclassify, restrict, or destroy such evidence would expose the Town and responsible officials to serious civil, administrative, and other legal consequences.

18. Consistent with his professional, ethical, and legal duties, Plaintiff insisted that the surveillance footage, access-control logs, alarm records, dispatch artifacts, and associated metadata be preserved intact; retained pursuant to Town policy and established retention settings; and remain technically accessible and retrievable through established channels in response to lawful process, including subpoenas, court orders, litigation holds, and investigations.

19. Plaintiff further insisted that export functionality remain enabled; that audit logs remain intact; that retention and backup rules not be altered to accelerate deletion; and that no "technical workaround" be implemented to render the evidence practically unreachable, deniable, or non-disclosable.

20. Plaintiff refused to delete, alter, misclassify, conceal, overwrite, corrupt, "lose," or otherwise manipulate any electronic evidence. He refused to make false statements about the existence or availability of footage. He refused to participate in any effort designed to make evidence functionally disappear while maintaining plausible deniability.

21. Plaintiff's refusal placed him in direct conflict with senior Town leadership, whose overriding objective became controlling access to the footage, restricting knowledge of its contents, limiting who could retrieve or export it, and preventing the creation of a clear and auditable evidentiary record that could expose mishandling, concealment, or obstruction.

22. Shortly after Plaintiff resisted improper directives, his authority was undermined, his professional judgment was questioned, his conduct was reframed as problematic, and heightened scrutiny was directed toward him. The Town began treating the custodian of the evidence as the problem, rather than the misconduct documented by the evidence.

23. Defendants then initiated and advanced a pretextual disciplinary and termination process designed not to address genuine performance issues, but to construct a justification for removing the one employee who possessed both (a) the technical control necessary to preserve and produce the evidence and (b) firsthand knowledge of the evidence's existence and the Town's response to it.

24. Plaintiff was forced out of his employment through a termination-threatened, resignation-pressured separation to eliminate a witness, remove the lawful custodian of the CCTV and electronic-logging environment, and consolidate control over politically catastrophic evidence within individuals willing to comply with improper concealment directives.

25. Plaintiff's termination served a dual purpose: silencing a whistleblower and sending a clear institutional message that employees who insist on lawful evidence preservation, truthful classification, and transparency will lose their careers.

26. Plaintiff's termination did not occur in isolation. It occurred within a broader municipal pattern in which the Town identifies employees who possess knowledge of politically damaging electronic evidence, targets those employees for investigation and discipline, and removes them rather than investigate the misconduct revealed by the evidence.

27. That pattern is corroborated by the lawsuit of Jeffrey Noble, a former Town Innovation and Technology employee who reported the existence and contents of the same Town Hall after-hours surveillance footage and related access-control irregularities, and who was

thereafter investigated, disciplined, and terminated after he refused to retract, minimize, or suppress what he knew about the footage and the Town's handling of it.

28. The same pattern is further corroborated by the lawsuit of Frank Falzone, former Assistant Chief of Police, who possessed independent knowledge of the Mayor's after-hours entry into Town Hall, raised concerns regarding the integrity and handling of electronically stored evidence tied to politically sensitive incidents involving the Mayor and senior leadership, and who was likewise targeted, marginalized, and forced into involuntary retirement after pursuing those concerns.

29. The pattern is also corroborated by sworn testimony, exhibits, and admissions in the Gray Local Media/WBTV public-records litigation, which confirm the existence of Town Hall surveillance footage, alarm activations, a law-enforcement response, and senior officials' access to and control over the video and related records.

30. Across these matters, the Town's playbook is consistent: when evidence threatens powerful officials, the Town does not investigate the officials; it investigates the employees who know where the evidence is, who insist on preserving it, and who refuse to participate in burying it.

31. Plaintiff brings this action to vindicate his rights under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and to expose a municipal system that treats evidence as a political liability and truth-telling employees as expendable. To the extent any statutory whistleblower protections are found applicable, Plaintiff pleads those protections in the alternative.

**Jurisdiction and Venue**

32. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United

States, including the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

33. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4), which confer jurisdiction on federal district courts to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and to secure equitable and other relief under Acts of Congress providing for the protection of civil rights.

34. To the extent Plaintiff seeks declaratory and/or prospective injunctive relief, this Court has authority to grant such relief pursuant to 28 U.S.C. §§ 2201–2202 and its inherent equitable powers, as supplemented by 42 U.S.C. § 1983.

35. Defendant Town of Mooresville, North Carolina is a municipal corporation organized and existing under the laws of the State of North Carolina. The Town is a "person" subject to suit within the meaning of 42 U.S.C. § 1983 and may be held liable for constitutional violations caused by its official policies, customs, practices, and/or decisions and ratification by final policymakers.

36. At all times relevant, the individual Defendants were officials and/or employees of the Town of Mooresville and exercised authority derived from state and municipal law. In committing the acts alleged herein, each individual Defendant acted under color of state law, under color of office, and within the course and scope, or apparent course and scope, of his or her official duties and authority.

37. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the Town resides in this District for venue purposes pursuant to 28 U.S.C. § 1391(c)(2), and the individual Defendants reside in this District.

38. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including in Iredell County, North Carolina, where Plaintiff worked; where the relevant municipal systems, servers, and electronic records are maintained; where the retaliatory decisions were made and implemented; and where Plaintiff suffered the adverse employment action.

39. Venue is further proper because the municipal policies, customs, practices, and decisions challenged in this action, including decisions by senior officials and final policymakers affecting evidence-preservation practices, access restrictions, and retaliatory discipline, were formulated, ratified, and implemented within the Western District of North Carolina.

## Parties

40. Plaintiff Chris Lee is a resident of North Carolina and, at all times relevant, was employed by Defendant Town of Mooresville as its Director of Innovation and Technology ("IT Director"). In that capacity, Plaintiff served as the Town's senior executive responsible for the administration, operation, security, and integrity of the Town's information-technology environment, including municipal networks, enterprise servers, data-retention architecture, access-control and credentialing systems, electronic audit logs, cybersecurity controls, and the Town's closed-circuit television ("CCTV") surveillance infrastructure. As Director of Innovation and Technology, Plaintiff held ultimate administrative authority over the same systems and records environment in which former IT employee Jeffrey Noble operated, placing Plaintiff in a position to confirm and authenticate irregularities Noble had flagged.

41. Plaintiff's position placed him at the apex of the Town's technical authority structure with respect to electronic records, digital evidence, and surveillance systems. Plaintiff was charged with ensuring that municipal electronic records were preserved, secured, auditable, accessible, and handled in compliance with Town policy and lawful process. His duties

included supervising IT personnel; assigning and revoking system permissions; controlling administrative access to surveillance and security platforms; managing retention schedules; maintaining backup and disaster-recovery systems; and assisting Town leadership, the Town Attorney, and outside counsel with records requests, subpoenas, litigation holds, court-ordered productions, and related preservation obligations.

42. Plaintiff performed his duties competently and satisfactorily. Prior to the events at issue, he had not been subjected to legitimate discipline for job-performance deficiencies. Plaintiff also held a constitutionally protected interest in continued employment and/or in the benefits and status of his position, and he was entitled to due-process protections before being deprived of that interest.

43. Plaintiff engaged in protected activity when he refused to participate in the suppression, concealment, misclassification, manipulation, restriction of access to, or obstruction of municipal electronic records and evidence, and instead insisted that politically sensitive digital evidence be preserved and handled consistent with Town policy and lawful process.

44. Plaintiff was cited for terminatin a because of this protected activity, and because his continued employment, custodial authority, and technical knowledge posed a direct obstacle to Defendants' efforts to control, suppress, and neutralize politically damaging electronic evidence.

45. Defendant Town of Mooresville, North Carolina is a municipal corporation organized and existing under the laws of the State of North Carolina and is a "person" within the meaning of 42 U.S.C. § 1983. At all times relevant, the Town maintained and enforced policies, customs, and practices governing employee discipline, information-technology governance, evidence retention and preservation, surveillance systems, and internal investigations. The

Town is responsible for constitutional violations caused by its official policies and customs and by actions and ratification of its final policymakers.

46. Defendant Tracey Jerome is, and at all times relevant was, the Town Manager of Mooresville. As Town Manager, Jerome exercised top-level administrative authority over Town departments, including Information Technology, Police, Human Resources, and Finance, and exercised final authority and/or final decision-making influence with respect to personnel discipline and the disposition and handling of politically sensitive matters. Jerome had authority to direct or approve investigations, approve or ratify disciplinary actions and termination decisions, and determine how incidents implicating senior Town officials would be routed, characterized, and managed. Jerome personally participated in, directed, approved, and/or ratified actions that resulted in the targeting, investigation, and termination of Plaintiff. Jerome is sued in her individual and official capacities.

47. Defendant Chris Carney is, and at all times relevant was, the Mayor of the Town of Mooresville. As Mayor, Carney was the Town's chief elected official, presided over the Board of Commissioners, and served as the public face of Town government. Carney exercised substantial influence over municipal priorities and over how Town leadership responded to politically sensitive incidents. Carney had a personal interest in avoiding scrutiny of the after-hours Town Hall incident described in this Complaint and used his influence, directly and/or through subordinates, to affect the Town's response to that incident and to retaliate against employees who possessed knowledge of, or control over, the related evidence, including Plaintiff. Carney is sued in his individual capacity.

48. Defendant Ron Campurciani is, and at all times relevant was, the Chief of Police of the Mooresville Police Department. In addition to serving as Chief of Police, Campurciani was appointed to and assumed the additional position of Assistant Town Manager while

continuing to serve as Police Chief, thereby holding dual executive roles within Town government. In these capacities, Campurciani exercised final operational authority over police operations, internal affairs, evidence-handling practices, and disciplinary recommendations within the Police Department, and he further held enhanced administrative authority within the Town's senior management structure. Campurciani possessed authority to open or decline investigations, refer matters for internal review, and influence how incidents involving Town leadership were characterized, routed, and addressed. Campurciani personally participated in and/or ratified decisions to minimize the Mayor's after-hours Town Hall incident, to restrict inquiry and access to related records, and to support actions targeting custodians of the underlying electronic evidence. Campurciani is sued in his individual and official capacities.

49. Defendant Chris Quinn is, and at all times relevant was, a senior Town official with executive authority over municipal finance and budgetary operations. Quinn participated in senior-leadership decision-making affecting contracting, vendor payments, professional-services expenditures, internal resource allocation, and the approval and oversight of outside consultants and technology vendors. Upon information and belief, Quinn possessed knowledge of politically sensitive matters affecting Town leadership and participated in, approved, and/or ratified actions designed to protect senior officials and marginalize employees whose continued roles threatened to expose damaging evidence, including Plaintiff. Quinn is sued in his individual capacity.

50. At all times relevant, each individual Defendant acted under color of state law, within the course and scope of his or her employment or apparent authority, and in concert with other Defendants.

51. The acts and omissions of each Defendant were a proximate cause of Plaintiff's injuries. Defendants knowingly participated in, directed, approved, ratified, or acquiesced in a coordinated course of conduct designed to suppress evidence, retaliate against whistleblowers, and remove custodians of politically damaging digital records.

### Town CCTV System and IT Authority Structure

52. The Town of Mooresville operates a centralized closed-circuit television surveillance system ("CCTV System") installed in and around municipal facilities, including Town Hall. The CCTV System is administered through the Town's Information Technology function and integrated with related municipal security infrastructure, including electronic access-control and credentialing systems, intrusion alarms and motion-detection sensors, network servers and storage arrays, retention and backup repositories, and system-generated audit logging. Together, these systems form a unified electronic security and evidence environment designed to record, store, correlate, and preserve digital records of access events, security incidents, and activity within Town facilities.

53. The Town has adopted written policies governing the purpose, placement, operation, and access to CCTV cameras. Those policies reflect that the CCTV System exists for legitimate governmental functions such as building security, deterrence of crime and misconduct, protection of employees and property, and the capture and preservation of video evidence relating to incidents occurring within or around Town facilities. The policies further reflect that CCTV footage is an official municipal record that is subject to retention, auditability, and production through lawful process.

54. Consistent with those purposes, Town policy authorizes camera placement in public and security-sensitive areas such as common areas, hallways, entrances and exits, parking areas, exterior approaches, and other locations where unauthorized access or security incidents may

occur. The policy prohibits cameras only in locations where individuals have a reasonable expectation of privacy, such as restrooms. Town Hall hallways, entrances, and common areas are therefore expressly contemplated locations for surveillance coverage.

55. The CCTV System is configured with tiered user-permission levels. Lower-tier users may view live or archived footage within the limits of assigned permissions. Higher-tier administrative users possess elevated authority to perform critical functions, including preserving, exporting, and managing archived footage; maintaining retention settings; and supporting productions required by lawful process. Under Town policy, the highest-tier administrative user is authorized to (a) copy and export archived footage, (b) provide exports upon request of senior administrative officials and Town legal counsel, and (c) assist with subpoenas, litigation holds, court orders, and related productions involving the Town.

56. Under Town policy and longstanding practice, the assignment of access, permission levels, and export authority is administered through the Town's Information Technology function and controlled by the system's technical permission structure. Senior officials who require footage or preservation actions ordinarily must request technical assistance from personnel with appropriate administrative credentials, and those actions are implemented within the parameters of policy and system controls.

57. At all relevant times, Plaintiff Chris Lee served as the Town's Director of Innovation and Technology ("IT Director") and was the senior executive responsible for administering the CCTV System and the Town's broader digital-records environment. Plaintiff's responsibilities included assigning and revoking CCTV access, establishing and enforcing permission levels, managing storage and retention architecture, maintaining system integrity and availability, supervising IT personnel, and supporting lawful productions and preservation obligations involving Town electronic records.

58. The CCTV System automatically generates system-level audit logs reflecting user access, configuration changes, exports, deletions, and other administrative actions. These audit logs are created by the system itself, are integral to evidentiary integrity, and are not within the ordinary control of standard end users. Actions affecting the existence, accessibility, exportability, retention configuration, or auditability of CCTV footage require administrator-level permissions and necessarily leave technical footprints capable of showing whether footage was accessed, exported, restricted, preserved, or manipulated.

59. Plaintiff was also aware through his direct oversight of the Town's information-technology environment that elevated system access was sometimes exercised through shared or non-individuated administrative credentials for critical platforms, including the Town's surveillance and evidence-adjacent systems. As a result, certain system logs reflecting exports, deletions, or permission changes could identify that an action occurred within an administrator-level environment yet not reliably attribute that action to a single individual user. This heightened the importance of preserving unaltered audit trails, retention settings, and export functionality, because technical footprints were the Town's primary means of detecting and authenticating improper handling of politically sensitive records.

60. By virtue of these policies, technical controls, and Plaintiff's duties, Plaintiff functioned as the lawful custodian of the Town's CCTV footage and related digital records. Plaintiff's custodial responsibilities included preserving integrity, maintaining retention settings, ensuring audit logging remained enabled, and keeping export functionality available for lawful requests.

61. Plaintiff's role and technical authority also meant that he could identify, preserve, and authenticate system integrity, and could determine whether administrative actions were being used to restrict access, reduce visibility, prevent auditable tracking, or render evidence

practically unreachable. Accordingly, Plaintiff's continued employment and custodial authority constituted a direct obstacle to any effort to secretly control, suppress, misclassify, or neutralize politically damaging surveillance evidence through "technical" means while preserving plausible deniability.

## Mayor's After-Hours Entry into Town Hall and Generation of Corroborating Electronic Records

62. On or about October 10, 2024, during the early morning hours, Defendant Chris Carney, the sitting Mayor of Mooresville, entered Town Hall after normal business hours. Electronic access-control and swipe-card records maintained by the Town reflect that credentials assigned to Carney were used to unlock and access the building at approximately 12:25 a.m., at a time when Town Hall was closed to the public and not staffed for ordinary municipal operations.

63. Upon information and belief, Carney's entry was not associated with any publicly scheduled meeting or publicly announced Town function. Further, there was no ordinary operational need requiring the Mayor's after-hours presence at Town Hall that was disclosed to, or documented for, Plaintiff in the course of his custodial and administrative responsibilities.

64. Following Carney's entry, Town Hall's integrated security infrastructure recorded multiple interior motion-detection activations during the overnight hours, including motion triggers at approximately 2:42 a.m. and approximately 4:17 a.m. These motion events were flagged by the Town's monitoring systems as atypical for overnight conditions and transmitted as potential security events requiring assessment.

65. In response to the alarm and motion activity, Mooresville Police Department personnel were dispatched to Town Hall. Computer-aided dispatch ("CAD") records and police incident logs reflect that officers were sent to the building in connection with the alarm events and

that multiple officers responded. These dispatch and response records independently corroborate that the Town's own systems treated the activity inside Town Hall as a potential security issue requiring law-enforcement assessment.

66. During the same timeframe, Town Hall's CCTV cameras captured Carney's after-hours presence inside the building. The CCTV footage is time-synchronized with the Town's access-control logs and alarm/motion data, creating a multi-source electronic record showing that Carney entered Town Hall after midnight and was present and moving through interior areas during the period in which motion detectors were activated and police were dispatched.

67. The combination of (a) credentialed access records, (b) interior motion-detection events, (c) alarm-monitoring data, (d) police dispatch and response logs, and (e) CCTV footage constitutes a corroborated digital trail documenting an after-hours security incident inside a government facility involving the sitting Mayor. These records were generated by Town systems, stored within Town-controlled infrastructure, and maintained within the Town's retention and backup environment.

68. The CCTV footage and associated electronic records therefore constitute official municipal records. They are not informal observations, rumors, or second-hand accounts, but contemporaneous electronic evidence created by the Town's own security and information systems in the ordinary course of operations.

69. The existence of this corroborated digital record rendered the incident materially different from a routine "false alarm." Unlike a typical accidental trigger, the Town possessed objective evidence identifying who accessed the building, when access occurred, that interior movement occurred during the overnight period, and that police were dispatched in response.

70. Because the incident involved the sitting Mayor, and because the Town possessed synchronized electronic records capable of objectively establishing his after-hours presence and movements inside Town Hall, the incident was immediately politically sensitive. Town leadership understood that the integrity, accessibility, and handling of the records themselves presented a reputational and institutional risk.

71. From the moment these records were generated, the central issue for Town leadership was not whether evidence existed, but who controlled it, who could access it, who could export it, and whether an auditable trail would exist revealing who viewed, copied, exported, restricted, or otherwise handled the evidence. That dynamic placed the Town's information-technology function, and Plaintiff as the senior custodian of the relevant systems and records environment, at the center of the controversy.

**Senior Officials Viewed the CCTV Footage and Chose Containment Over Investigation**

72. Senior Town leadership became aware shortly after the October 10, 2024 incident that CCTV footage, access-control logs, alarm data, and police dispatch records existed documenting Mayor Carney's after-hours presence inside Town Hall. Because the incident involved the sitting Mayor and because the Town possessed synchronized, time-stamped electronic records capable of objectively establishing entry, movement, and a police response, Town leadership recognized the matter as politically sensitive and potentially damaging if subjected to normal investigative processes.

73. Upon information and belief, Defendant Tracey Jerome, the Town Manager, assumed control over the Town's internal handling of the incident. Upon further information and belief, Defendant Ron Campurciani and Town legal counsel were involved in reviewing, assessing, and discussing the CCTV footage and related electronic records. Senior officials

personally viewed the footage and/or received detailed briefings from individuals who viewed it, thereby obtaining knowledge of the footage's substance and its political sensitivity.

74. Following that review and/or briefing, and despite the existence of credentialed access records, multiple interior motion activations, alarm-monitoring data, and police dispatch logs, the incident was internally minimized and characterized as a "false alarm" or its equivalent, and it was treated as not requiring further investigation. Upon information and belief, Jerome accepted and ratified that characterization. No meaningful criminal investigation was opened; no internal-affairs or administrative investigative file was created; no evidence inventory or written findings were generated; and no referral was made to an outside agency for independent review.

75. This choice not to investigate was not driven by a lack of objective evidence. It was made in the face of multiple independent Town systems generating corroborating records and after senior officials had access to, and knowledge of, the video and associated data. The choice therefore reflected a deliberate determination to foreclose scrutiny rather than to determine what occurred.

76. The Town's containment strategy extended beyond declining investigation and into controlling disclosure about the footage itself. In sworn depositions in public-records litigation involving Town Hall surveillance records, witnesses were prevented from answering questions about what the CCTV footage depicts. The Town did not deny the footage existed or claim it was missing or corrupted; instead, sworn testimony about the footage's contents was not permitted, preventing disclosure of what the video shows.

77. Further corroborating the institutional resistance to meaningful inquiry, Adam Dillard, counsel to the Iredell County Sheriff's Office, stated that he personally drafted a formal request for a State Bureau of Investigation ("SBI") investigation and that the Iredell County

Sheriff signed that letter. Upon information and belief, this occurred on or about February 2025. Upon information and belief, efforts were also made to involve Iredell County prosecutorial leadership in an investigative effort concerning the same underlying misconduct and electronic-evidence issues, but those efforts were declined or did not proceed, leaving the broader allegations without an independent inquiry despite the existence of corroborating electronic records.

78. Further corroborating notice to final decisionmakers and the need for independent inquiry, on or about March 25, 2025, the North Carolina Police Benevolent Association, through its staff representative Brandon McGaha, transmitted written notice to Town Manager Tracey Jerome, with Police Chief Ron Campurciani copied, stating that the organization had received information concerning possible employee retaliation for whistleblowing involving Mayor Carney and a traffic stop, and further stating that if the information received was accurate, the matter appeared better suited for review by the State Bureau of Investigation. The PBA correspondence requested confirmation whether the SBI had been made aware of the situation and whether the events were being examined, placing Town leadership on direct notice that the allegations implicated public integrity concerns beyond routine personnel issues.

79. Consistent with the investigative deadlock described above, in written communications regarding these matters, an FBI agent advised that the SBI had been briefed but had not been requested to open an investigation by a law-enforcement agency head, a district attorney, or a judge, and that absent such a request the SBI was not permitted to open an investigation. This further corroborates that efforts to trigger independent review were impeded, notwithstanding the existence of corroborating electronic records and the public-integrity implications of the incident.

80. Upon information and belief, in response to at least one public-records request concerning the October 10, 2024 Town Hall incident and the related alarm events and police response, Town legal counsel oversaw the Town's production. In connection with that request, Plaintiff was asked to assist the legal team with responsive electronic records and personally reviewed the responsive dispatch materials and computer-aided dispatch ('CAD') information made available internally for collection and submission. Plaintiff personally observed that CAD narrative entries and/or CAD chat/commentary reflecting the alarm activations, officer dispatch to Town Hall, and officer observations including references to the Mayor being present upstairs after hours with a woman were omitted and removed from the final production released by the Town. Plaintiff raised the omission directly with Town Attorney Sharon Crawford and stated that he had seen the responsive CAD commentary deleted/removed from the records production; Crawford responded in substance that the Town would respond with what it chose to respond with, confirming an intent to restrict disclosure of corroborating electronic records concerning the Mayor's after-hours presence and the law-enforcement response.

81. Separately, Carney publicly acknowledged that he went to Town Hall late at night and that surveillance cameras would show him inside the building, including in interior areas such as hallways and near restrooms. The Town has not credibly disputed the existence of the synchronized electronic records reflecting after-hours access, interior motion activity, alarm events, and police dispatch. Instead, the Town has treated the incident as a political liability to be managed and contained, not as a security event to be examined through normal accountability mechanisms.

82. Plaintiff personally observed, in the course of performing his custodial and production-assistance duties, that Axon body-worn camera system metadata for the January 30, 2024

traffic-stop event reflected manual activation, yet the corresponding video file was deleted from the Town's Axon evidence-management system approximately twenty-three seconds after activation. Plaintiff further observed that the deletion entry reflected removal from within the Town's centralized Axon environment, access to which was controlled by elevated permissions. Based on Plaintiff's training and experience administering Town systems, and on his direct review of the Axon evidence environment, such a rapid deletion was inconsistent with routine technical malfunction and instead indicated purposeful removal by a user with sufficient system privileges.

83. By choosing containment over investigation, Town leadership necessarily shifted its focus from determining what occurred to controlling who possessed access to the evidence, who could export it, who could authenticate it, and who could testify about it. That strategic shift placed the Town's IT custodians and system administrators, including Plaintiff, into direct conflict with senior leadership, because Plaintiff's job duties required preservation, retention, auditability, and lawful accessibility of the very records Town leadership sought to insulate from scrutiny.

**Independent Corroboration of the Video Content and Retaliation Against Other Custodians**

84. Former Town IT employee Jeffrey Noble independently acquired knowledge of the Town Hall CCTV footage documenting Mayor Carney's after-hours entry and interior movement. Beginning in mid-October 2024 (on or about October 15, 2024), Noble reported internally that the footage showed Carney entering Town Hall after midnight accompanied by an adult woman and engaging in conduct inside the building that was embarrassing and politically damaging.

85. Upon information and belief, Noble specifically reported that the footage depicted Carney moving through interior areas of Town Hall in a state of partial undress, including without

pants, for a period of time captured on the CCTV system. Noble's report was not presented as rumor; it was communicated as an account grounded in his system access and exposure to the Town's surveillance environment.

86. Noble's knowledge did not arise from public speculation. As a Town IT employee with system-level exposure to the Town's security platforms and related infrastructure, Noble had technical familiarity with the CCTV environment, access-control logs, and associated systems. His reporting therefore constituted independent corroboration from within the Town's own technology and evidence-custody chain that the footage existed, remained accessible, and contained unusually sensitive content.

87. Rather than investigate the conduct reflected by the Town's own electronic records, Town leadership redirected attention toward Noble himself. Noble was questioned about system access, subjected to internal scrutiny and investigation, and ultimately terminated. Noble has alleged that his discipline and termination were causally connected to his reporting regarding the Mayor-related Town Hall footage and his knowledge of the associated access-control and surveillance records documenting the incident.

88. Noble's termination followed the same institutional pattern later applied to Plaintiff: when an employee within the Town's technology or evidence-custody chain acquires knowledge of politically damaging electronic records and refuses to treat those records as nonexistent, harmless, or beyond inquiry, that employee becomes the target of investigation and removal.

89. Upon information and belief, media reporting and Town records further reflected that Jaime Gatton, the adult woman associated with Carney's after-hours presence at Town Hall, had a financial relationship with the Town as a paid communications consultant. That relationship increased the political and reputational stakes of the footage and provided additional motive

for senior officials to restrict access, control the narrative, and neutralize employees capable of exposing or authenticating the evidence.

90. By the time Plaintiff became implicated as another custodian with knowledge of, and authority over, the CCTV System and related electronic records environment, Town leadership had already demonstrated a willingness to address the Mayor-related Town Hall incident not by investigating the underlying conduct, but by targeting and eliminating employees who knew about the evidence. Plaintiff therefore entered an environment in which the retaliatory playbook had already been deployed.

## Plaintiff's Knowledge, Position, and Custodial Exposure

91. As the Town's Director of Innovation and Technology, Plaintiff occupied the highest technical and custodial position within the municipal structure with respect to electronic records, digital evidence, and surveillance systems. Plaintiff possessed administrator-level authority over the Town's CCTV System, access-control platforms, server and storage environments, retention architecture, and export functionality. His duties included configuring permissions; assigning and revoking access; maintaining retention and backup settings; preserving system integrity and auditability; and ensuring that electronic records were preserved and producible through lawful process, including subpoenas, court orders, and litigation holds. In practical terms, Plaintiff's role materially affected whether politically sensitive digital evidence remained intact, auditable, and capable of lawful disclosure.

92. Through the performance of his duties, Plaintiff became aware that CCTV footage existed depicting Mayor Carney's after-hours entry into Town Hall and interior movement within the building. Plaintiff further became aware that the footage was stored within Town-controlled systems; that access-control records, motion/alarm events, and dispatch records corroborated the incident; and that the event was being treated internally as unusually

sensitive. Upon information and belief, senior Town officials viewed the footage and/or received detailed briefings regarding its contents.

93. Plaintiff also became aware that, notwithstanding the corroborated electronic record, Town leadership had elected to minimize and contain the incident, including by characterizing it as a "false alarm" or its equivalent, and by declining to open a meaningful investigation or create a normal investigative file, evidence inventory, or findings that would document what occurred and how the Town handled the evidence.

94. Plaintiff understood that the Town's ability to contain the fallout depended not only on controlling the narrative, but also on controlling the custodians and the audit trail. Plaintiff knew that as long as he remained IT Director, the CCTV footage and related records could not be quietly erased, denied, or rendered inaccessible without requiring administrative actions that would leave technical footprints, including changes to permissions, retention settings, export functionality, or audit logs. Plaintiff's continued employment therefore meant that an independent, knowledgeable custodian remained in place who could authenticate the existence of the evidence, explain how the systems operate, and identify whether "technical" actions were being used to suppress or conceal records.

95. Plaintiff thus became an institutional liability to Defendants not because of any wrongdoing, but because of what he controlled and what he could later attest to. His technical authority, custodial responsibilities, and knowledge of the Mayor-related Town Hall incident made him an obstacle to any strategy premised on suppression, misclassification, restriction of access, or quiet burial of evidence.

96. Plaintiff's custodial exposure placed him in the same category as other Town employees who occupied positions giving them visibility into, and the ability to authenticate, politically sensitive electronic evidence. Plaintiff understood that employees with comparable exposure

had been targeted for scrutiny and removed after acquiring similar knowledge, reinforcing that the pressure applied to him was not benign, but consistent with a broader municipal pattern of eliminating custodians rather than confronting the underlying misconduct reflected in Town records.

97. In sum, Plaintiff did not become a target because of performance issues or misconduct. He became a target because he knew the Mayor-related evidence existed, knew it was stored and corroborated by other Town systems, and controlled the technical environment that made continued concealment difficult and auditable.

**Efforts to Control or Suppress the Evidence and Pressure Placed on Plaintiff**

98. After it became known within senior Town leadership that Plaintiff was aware of the Mayor-related after-hours Town Hall footage and possessed custodial authority over the CCTV System, Plaintiff was subjected to escalating pressure to treat the footage as exceptional, sensitive, and outside ordinary policy channels. Rather than directing Plaintiff to ensure preservation and lawful handling, Town leadership conveyed, both expressly and through course of conduct, that the footage was not to be handled like other municipal security records.

99. Upon information and belief, Plaintiff was pressured to limit who could view the footage, to refrain from facilitating exports, and to treat the records as categorically insulated from routine disclosure and production channels, notwithstanding that the footage constituted Town-generated security video and related electronic records ordinarily subject to retention, auditability, and production through lawful process.

100. Upon information and belief, Plaintiff was further pressured to avoid creating or preserving clear audit trails reflecting access, review, or export of the footage and to tolerate and/or implement configurations that would make the footage practically difficult to retrieve

in response to subpoenas, court orders, litigation holds, and other lawful requests. These pressures included discouragement from documenting preservation steps; resistance to confirming and maintaining export capability; and resistance to routine safeguards designed to ensure evidentiary integrity, auditability, and retrievability.

101.     In early February 2025, after senior Police Department personnel sought assistance locating or accounting for missing body-worn camera footage relating to the January 30, 2024 traffic-stop event, Plaintiff became aware that retrieval and accountability efforts were being treated as politically sensitive and were being frustrated or discouraged. Plaintiff further became aware that pressure was increasing on IT personnel to treat key records as unrecoverable, non-producible, or outside normal production channels, notwithstanding Plaintiff's understanding that the Town's systems and permissions structure permitted proper preservation, auditing, and lawful production.

102.     These pressures directly conflicted with written Town policy, the technical design of the CCTV System, and Plaintiff's professional responsibilities as IT Director. Plaintiff understood that Town policy and system architecture contemplated preservation, auditable access controls, and the ability to export footage through established channels upon request by authorized officials and/or in response to lawful process. Plaintiff further understood that intentionally degrading accessibility, disabling export functionality, or obscuring audit trails would compromise evidentiary integrity and would function as suppression by technical means.

103.     Plaintiff reasonably perceived that the purpose of these pressures was not operational efficiency, system security, or routine governance, but concealment. The pressures arose specifically with respect to the Mayor-related footage, were inconsistent with how other CCTV incidents were handled, and aligned with the Town's broader pattern of

managing politically sensitive electronic evidence by restricting access, minimizing transparency, and targeting custodians.

104. Plaintiff understood that acquiescing in these demands would expose him to professional and legal risk and would entangle him in evidence-handling conduct inconsistent with his duties and with lawful process. Plaintiff refused to implement or tolerate measures designed to suppress, obscure, restrict, or render inaccessible the Mayor-related footage and associated electronic records.

105. Defendants' efforts to control the evidence therefore shifted from attempting to control the systems to attempting to control the custodian. When Plaintiff would not bend the systems to conceal the evidence, Defendants moved toward bending the employment relationship through scrutiny, pretextual discipline, and termination.

## Plaintiff's Protected Refusal and Insistence on Compliance

106. Plaintiff refused to delete, alter, misclassify, conceal, suppress, restrict, or manipulate any CCTV footage, access-control logs, alarm records, dispatch artifacts, or related electronic evidence concerning the Mayor's after-hours entry into Town Hall. Plaintiff refused to disable export capability, refused to degrade administrative functionality designed to preserve evidentiary integrity and auditability, and refused to implement technical changes intended to frustrate or defeat lawful production. Plaintiff further refused to make false statements suggesting that footage did not exist, could not be located, or was unavailable for production.

107. Plaintiff instead insisted that the footage and associated electronic records be preserved intact; retained pursuant to established retention and backup settings; and maintained in a manner that allowed retrieval and export through established channels in response to lawful process, including subpoenas, court orders, and litigation holds. Plaintiff

maintained that the CCTV System must continue to function according to Town policy and standard technical practice, without special carve-outs or shadow restrictions imposed solely to shield politically sensitive material.

108.     Plaintiff communicated internally that suppressing, obscuring, or rendering inaccessible municipal electronic records would violate Town policy and would compromise evidentiary integrity. Plaintiff made clear that he could not participate in any effort to degrade system integrity, conceal or defeat audit logging, or create false narratives about the existence, accessibility, or exportability of the footage.

109.     Plaintiff's refusals and insistence on compliance were undertaken in good faith and were directed to matters of public concern, including governmental integrity, the preservation of official records, and the truthful handling of electronically stored evidence implicating senior municipal leadership. Plaintiff reasonably believed, and continues to believe, that his conduct was necessary to ensure lawful and ethical government operations and to prevent the misuse of municipal systems to conceal politically damaging evidence.

110.     Plaintiff's protected conduct directly obstructed Defendants' efforts to control, suppress, and neutralize the Mayor-related footage and associated records. Plaintiff's continued employment, custodial authority, and technical competence therefore became incompatible with Defendants' objective of containing the political and institutional fallout associated with the evidence.

111.     As a direct and proximate result of Plaintiff's protected refusals and insistence on lawful handling of electronic evidence, Defendants began the process of isolating Plaintiff, undermining his authority, escalating scrutiny, and positioning him for removal through pretextual discipline and termination.

**Retaliation Against Plaintiff and Escalation of Pretext**

112.     After Plaintiff refused to participate in suppression and instead insisted on preservation, auditability, and lawful accessibility of the Mayor-related footage and associated electronic records, senior Town leadership began treating Plaintiff as the problem rather than the underlying misconduct documented by Town systems. Plaintiff's lawful custodial decisions were reframed as "judgment issues," his adherence to policy and system integrity was recast as "rigidity," and his insistence on compliance was characterized as insubordination.

113.     Plaintiff's authority over systems he administered was progressively undermined. He was excluded from meetings and communications involving surveillance infrastructure, access-control systems, and evidence-handling issues for which he remained formally responsible. Decisions affecting systems within his custodial portfolio were discussed or made without his involvement, contrary to ordinary operational practice and without legitimate technical justification.

114.     Plaintiff was subjected to heightened scrutiny that did not reflect his historical performance. Routine technical disagreements were escalated into management issues; ordinary administrative matters were reframed as disciplinary concerns; and benign conduct was viewed through a lens of suspicion. Meanwhile, Town officials and employees aligned with leadership's preferred approach to the Mayor-related evidence were not subjected to comparable scrutiny.

115.     Upon information and belief, this scrutiny was not a normal performance-management process but was intentionally amplified and documented to create a record that could later be cited as justification for discipline. The function of this process was to manufacture pretext and conceal the true motive: Plaintiff's refusal to compromise evidentiary integrity, auditability, and retrievability.

116.     Plaintiff's protected conduct was a substantial and motivating factor in the adverse shift in his treatment. Prior to his refusal to bend evidence-handling practices, Plaintiff was entrusted with expansive authority over Town systems and was not treated as a disciplinary problem. Only after Plaintiff obstructed efforts to restrict access, limit auditability, or impede export capability for the Mayor-related footage did leadership begin portraying him as uncooperative or problematic.

117.     The Town's treatment of Plaintiff mirrors its treatment of other employees who possessed knowledge of politically sensitive electronic evidence and whose roles enabled them to authenticate or produce it. In each instance, the Town avoided meaningful inquiry into the underlying misconduct and redirected institutional force toward the custodians and whistleblowers.

118.     This pattern reflects a deliberate municipal practice: when sensitive electronic evidence threatens powerful officials, the Town does not pursue accountability through ordinary investigative channels; it neutralizes the witnesses and custodians who make suppression difficult and who could later testify to what the systems contain, how the systems were configured, and who controlled access and exports.

## Weaponized Administrative Process

119.     After senior leadership determined that Plaintiff's continued employment posed an obstacle to controlling the Mayor-related footage and associated electronic records, the Town initiated a disciplinary and investigatory process against Plaintiff that, upon information and belief, was designed to remove him rather than to address any legitimate performance deficiency. The process functioned as an instrument of retaliation, not as a good-faith employment inquiry.

120.    The Town's Notice of Proposed Termination and supporting materials
mischaracterized Plaintiff's lawful custodial conduct as misconduct, selectively omitted or
minimized Town policies and established practices that authorized preservation, retention,
and export of surveillance footage through established channels, and reframed evidence-
preservation and auditability measures as "defiance" of management. Actions taken by
Plaintiff to preserve evidentiary integrity and maintain retrievability and export capability
were portrayed as insubordination, even though they were consistent with Town policy and
standard technical governance.

121.    The charges against Plaintiff were presented through distorted and decontextualized
descriptions of technical decisions, stripped of the system architecture and authority
structure governing the CCTV System and the IT Department. The Town did not identify
any instance in which Plaintiff destroyed data, falsified records, exceeded his administrative
authority, or violated written policy. Instead, the Town relied on vague and technical-
sounding characterizations designed to cast routine custodial and integrity functions as
wrongdoing.

122.    Plaintiff was not presented with the true basis motivating the Town's actions and
was not afforded meaningful notice of the real issue driving discipline and termination:
Plaintiff's refusal to compromise the integrity, auditability, and lawful accessibility of
politically sensitive electronic records. Rather than confronting the protected conduct at
issue, the Town substituted pretextual allegations intended to obscure retaliatory motive and
insulate decision-makers from scrutiny.

123.    Plaintiff was denied a meaningful opportunity to respond and clear his name. The
process did not involve a neutral evaluation of whether Plaintiff's actions were consistent
with Town policy and established practice, did not fairly consider exculpatory

documentation and technical context, and did not permit Plaintiff to fully present a defense grounded in his custodial responsibilities and the system's audit and retention architecture.

124.     Upon information and belief, the outcome of the process was predetermined. The investigation functioned to generate documentation supporting a foregone conclusion rather than to determine whether misconduct occurred. Town decision-makers had already determined that Plaintiff must be removed because of what he knew, what he controlled, and what he refused to do.

125.     The weaponized administrative process served multiple retaliatory objectives: removing a key witness; eliminating the lawful custodian of the CCTV System and related evidence environment; and consolidating control of politically sensitive digital evidence within personnel more willing to restrict access, limit auditability, or impede lawful production.

126.     The Town's conversion of internal discipline into a punitive tool against custodians and whistleblowers mirrors its treatment of other employees who raised evidence-integrity concerns, further evidencing a municipal custom of using administrative processes to suppress inquiry, manufacture pretext, and retaliate against protected activity.

### Termination and Causation

127.     Defendants pressured and forced Plaintiff to resign and cited him for termination, not for any legitimate performance-based reason, but because Plaintiff refused to suppress, conceal, misclassify, restrict access to, or otherwise compromise the integrity, auditability, and lawful accessibility of the Town Hall CCTV footage and associated electronic records documenting the Mayor's after-hours entry and related security events.

128.     Plaintiff's termination was the foreseeable and intended consequence of his protected refusal to participate in evidence suppression and his insistence that the footage

and related digital records be preserved intact, retained pursuant to established settings and practice, and remain retrievable and exportable through established channels in response to lawful process.

129.    Plaintiff's continued employment posed an ongoing threat to Defendants' containment strategy. As IT Director and senior custodian of the CCTV System and related records environment, Plaintiff possessed unique technical knowledge regarding where the footage and metadata resided, how retention and backups were configured, what audit logs existed, who had system-level access, and how the integrity of the records could be authenticated. Plaintiff's role also positioned him to identify administrative actions taken to restrict access, limit auditability, or impede exportability.

130.    By terminating Plaintiff, Defendants eliminated a key witness and custodian with direct knowledge of the Town's surveillance architecture and evidence environment and removed an independent administrator capable of verifying that the records existed, remained retrievable, and had not been manipulated or rendered inaccessible through technical means.

131.    Plaintiff's termination also allowed Defendants to reassign and/or concentrate control over CCTV administration, retention settings, and export permissions in personnel subordinate to the same leadership seeking to restrict inquiry, thereby reducing institutional resistance to improper directives and reducing the likelihood of independent authentication.

132.    The temporal proximity between Plaintiff's protected conduct and the initiation and escalation of disciplinary action, the absence of a legitimate performance-based history supporting termination, and the pretextual nature of the Town's stated reasons for discharge establish a direct causal connection between Plaintiff's protected refusals and his termination.

133.     Defendants' stated justifications for Plaintiff's termination are false, misleading, and post hoc rationalizations crafted to conceal retaliatory motive, to manufacture an appearance of legitimacy, and to deter other Town employees from insisting on evidence integrity and transparency.

134.     Plaintiff's protected conduct was a substantial and motivating factor in the termination decision, and the termination would not have occurred absent Plaintiff's refusal to compromise the integrity and accessibility of politically sensitive electronic records.

135.     Defendants' actions were intentional and knowing and were taken with deliberate indifference to Plaintiff's clearly established constitutional rights. Senior officials and final decisionmakers reviewed, approved, and/or ratified the retaliatory termination after being aware of Plaintiff's protected conduct, thereby converting the unconstitutional motive into official action attributable to the Town.

136.     As a direct and proximate result of Defendants' retaliatory termination, Plaintiff has suffered loss of employment, loss of income and benefits, damage to professional reputation, emotional distress, and other compensatory damages, and is entitled to all available legal and equitable relief.

### Pattern and Practice Supporting Municipal Liability

137.     Plaintiff's termination did not occur in isolation. It occurred within an established and ongoing pattern within the Town of Mooresville of treating politically damaging electronic evidence as an institutional liability to be contained, declining to pursue meaningful inquiry when senior officials are implicated, and retaliating against employees who report, preserve, authenticate, or refuse to manipulate such evidence.

138.     Former Town IT employee Jeffrey Noble reported the existence and sensitive content of the Town Hall CCTV footage depicting the Mayor's after-hours entry, along with

related access-control and surveillance-record concerns. Rather than pursue meaningful inquiry into the underlying incident or the integrity and handling of the Town's electronic records environment, the Town subjected Noble to scrutiny, investigation, discipline, and termination. Noble's termination eliminated a custodian with technical knowledge of the Town's surveillance, access-control, and evidence-retention infrastructure.

139.    Former Assistant Chief of Police Frank Falzone raised concerns regarding electronically stored evidence tied to politically sensitive incidents involving Town leadership, including issues relating to body-worn camera footage, CAD records, and evidence-handling practices. Falzone also raised concerns about the Mayor's after-hours presence at Town Hall and the handling of that incident. Falzone was thereafter subjected to administrative pressure, marginalization, and separation from employment through involuntary retirement or its functional equivalent.

140.    In each of these matters, the same sequence repeats: a. Politically sensitive electronic evidence exists; b. The evidence implicates or embarrasses senior Town officials; c. Town leadership declines to pursue meaningful inquiry into the underlying conduct; d. Town leadership instead focuses on controlling access, exports, and auditability, and on identifying the employees who know where the evidence resides or who insist on proper handling; e. Those employees are isolated, scrutinized, accused of policy violations or "judgment" problems, and subjected to disciplinary or termination proceedings; f. Custodians are removed, and control over the evidence environment is consolidated within personnel aligned with leadership's preferred outcome.

141.    This repeated sequence is not accidental. It reflects a municipal custom and practice of treating electronically stored evidence as a political risk to be managed rather than a

governmental record to be preserved, audited, and evaluated through ordinary accountability mechanisms.

142.     The pattern is further reinforced by the Town's conduct in related records-access litigation, where senior officials acknowledged the existence of Town Hall surveillance footage and related records but used litigation objections and instructions not to answer to prevent sworn testimony regarding the footage's contents, while maintaining the incident as something not requiring meaningful investigation.

143.     Final policymakers and senior decisionmakers, including the Town Manager and the Police Chief (who also held a dual executive role within Town management), personally participated in, directed, approved, and/or ratified retaliatory actions against Noble, Falzone, and Plaintiff, and knowingly allowed unconstitutional practices to continue.

144.     The Town has failed to train, supervise, and discipline senior officials and managers regarding the constitutional limits on retaliatory discipline, the protection of whistleblowers and evidence custodians, and the obligation to preserve evidentiary integrity and auditability when politically sensitive electronic records are involved, despite repeated incidents demonstrating predictable constitutional violations.

145.     The Town's deliberate indifference to these known risks has created and maintained an environment in which retaliation against evidence custodians is treated as an acceptable method of institutional self-protection, and in which "administrative" processes are used to manufacture pretext and deter protected activity.

146.     Plaintiff's termination was a direct manifestation of this municipal custom and practice and was undertaken pursuant to it, including through final-decisionmaker involvement and ratification after notice of Plaintiff's protected conduct.

147.    Accordingly, Defendant Town of Mooresville is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the constitutional violations suffered by Plaintiff were caused by official policy, longstanding custom and practice, final-policymaker decisions, and ratification.

148.    The Town's custom and practice of containment and retaliation was reinforced by a broader pattern of hostile workplace conduct and targeted departures under Town Manager Tracey Jerome. Upon information and belief, multiple senior employees reported that when they raised legitimate operational, policy, or compliance concerns, Jerome responded with hostility and intimidation rather than professional process, contributing to an environment in which disagreement with senior leadership, particularly on politically sensitive matters, was treated as disloyalty.

149.    Upon information and belief, this pattern contributed to the departure of key personnel with substantial institutional knowledge and public-safety responsibilities and to additional hostile-workplace disputes involving Town leadership. The result was a predictable chilling effect: employees learned that pressing for compliance, transparency, or independent review carried professional risk, while quiet acceptance of leadership's preferred narrative carried institutional protection.

150.    This environment is relevant to municipal liability because it reflects an operational culture tolerated and enforced by senior decisionmakers in which employees who insist on proper records handling, transparency, or independent review are isolated, attacked, and ultimately removed, while those willing to facilitate containment are protected and advanced. Plaintiff's termination fits within this repeatable municipal practice.

**First Claim for Relief:**
**First Amendment Retaliation (42 U.S.C. § 1983)**
**(Against All Individual Defendants and Town of Mooresville)**

151.     Plaintiff incorporates by reference and realleges each and every allegation contained

in the preceding paragraphs of this Complaint as if fully set forth herein.

152.     Plaintiff engaged in constitutionally protected activity when he refused to suppress,

conceal, misclassify, manipulate, restrict access to, or otherwise compromise the integrity,

auditability, and lawful accessibility of municipal electronic records and evidence, and when

he insisted that surveillance footage, access-control logs, alarm data, and related electronic

evidence be preserved, retrievable, exportable, and handled in accordance with Town policy

and lawful process.

153.     Plaintiff further engaged in protected activity by making internal disclosures and

reports; raising concerns regarding the integrity and handling of electronically stored

evidence; and refusing directives and pressures to treat the Mayor-related footage and

associated records as exempt from ordinary preservation, auditability, and production

channels. Plaintiff's protected conduct included refusing to make false statements about the

existence, accessibility, or exportability of such evidence.

154.     Plaintiff's disclosures and refusals addressed matters of public concern, including

governmental integrity; the handling and potential suppression of surveillance footage and

related security records; supervisory involvement in controlling the disposition of a

politically sensitive incident; the Mayor's after-hours presence inside a secured municipal

building; and misuse of administrative processes to shield politically connected individuals

from scrutiny while targeting the evidence custodian.

155.     The Town maintained an official Whistleblower Protection Policy (Administrative

Policy AP-ADM-011) that recognizes "matters of public concern" and "protected

disclosures" relating to abuse of authority, misconduct, gross mismanagement, and dangers

to public health or safety, and that prohibits retaliation through adverse personnel action.

156.     Plaintiff's disclosures and refusals were made through channels authorized by Town policy and established practice, including communications to Town leadership, Human Resources, Town legal counsel, and departmental leadership, and were of the type the Town's own policy contemplates should be addressed through investigation and lawful handling rather than suppression.

157.     Plaintiff's speech and refusal to engage in wrongdoing constituted protected activity under the First Amendment because it addressed matters of public concern and because Plaintiff's refusal to participate in evidence suppression and false narratives was not merely routine job-performance discretion, but a good-faith insistence on integrity in government recordkeeping and the lawful handling of evidence implicating senior municipal leadership.

158.     Defendants had actual knowledge of Plaintiff's protected activity through Plaintiff's reports, documented communications, preservation-related requests and objections, and the surrounding circumstances of the Mayor-related Town Hall incident and the Town's efforts to restrict access, auditability, and exportability.

159.     Defendants subjected Plaintiff to materially adverse actions, including unwarranted scrutiny and investigations, discipline, removal or reduction of authority and responsibilities, isolation from personnel and information necessary to perform his role, and ultimately termination and/or constructive separation from employment.

160.     Defendants' adverse actions were taken because of Plaintiff's protected activity. Plaintiff's protected activity was a substantial and motivating factor in Defendants' decisions, as shown by, among other things, the temporal proximity between Plaintiff's refusal to compromise evidence integrity and the escalation of scrutiny and discipline; deviations from ordinary practice; the targeting of Plaintiff through process rather than investigation of the

underlying incident; and pretextual characterizations of Plaintiff's custodial conduct as misconduct.

161.     Defendants' stated reasons for discipline and termination were false, misleading, and pretextual and were advanced to punish Plaintiff for protected activity and to deter similarly situated employees from engaging in protected speech and refusals, thereby chilling a person of ordinary firmness from insisting on lawful evidence handling and government transparency.

162.     Defendants lacked an adequate governmental interest sufficient to justify the retaliatory actions taken against Plaintiff for speaking on matters of public concern and refusing to participate in suppression or manipulation of municipal electronic records.

163.     As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered damages including loss of employment, lost income and benefits, emotional distress, and reputational harm.

164.     Defendants' actions violated Plaintiff's rights under the First Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983.

<u>**Second Claim for Relief:**</u>
<u>**Fourteenth Amendment – Procedural Due Process (Property Interest) (42 U.S.C. § 1983)**</u>
<u>**(Against All Defendants)**</u>

165.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

166.     Plaintiff possessed a constitutionally protected property interest in his continued public employment as Director of Innovation and Technology, including his salary, benefits, seniority, and career status, arising from Town personnel policies, established employment practices, and representations and procedures indicating he would not be terminated except for cause and pursuant to prescribed disciplinary procedures.

167.     Plaintiff also possessed a protected interest in receiving constitutionally adequate process before being deprived of that employment interest, including timely and meaningful notice of the charges, an explanation of the evidence, a meaningful opportunity to respond, and a decision by an impartial decisionmaker. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).

168.     Defendants deprived Plaintiff of these protected interests when initiated a proposed-termination disciplinary process and pressured his resignation through a procedure that concealed the true basis for discipline, relied on pretextual allegations and denied Plaintiff a meaningful opportunity to respond.

### Lack of Meaningful Notice

169.     Plaintiff was not provided meaningful notice of the true reasons for the proposed discipline and termination.

170.     The true basis motivating Defendants' actions was Plaintiff's refusal to suppress, conceal, misclassify, manipulate, or restrict access to politically sensitive electronic evidence and his insistence on preserving evidentiary integrity, auditability, and lawful accessibility of the Mayor-related footage and associated records.

171.     Instead of disclosing that basis, Defendants presented Plaintiff with technical-sounding and pretextual accusations that mischaracterized lawful custodial conduct as misconduct and obscured the actual retaliatory motive.

172.     By concealing the true charge and substituting pretextual allegations, Defendants deprived Plaintiff of the ability to understand, confront, and rebut the real basis for termination. Notice that omits the true reasons for termination is constitutionally inadequate.

### No Meaningful Opportunity to Be Heard

173.    Plaintiff was not afforded a meaningful opportunity to be heard at a meaningful time and in a meaningful manner.

174.    Plaintiff was not permitted to present a full defense grounded in his custodial responsibilities and Town policy governing preservation, retention, auditability, and export of surveillance footage and related electronic records through established channels and lawful process.

175.    Plaintiff was not permitted to present or develop evidence regarding, among other things: a. the existence, integrity, and auditability of the Mayor-related CCTV footage and associated electronic records; b. Town policies and established practices governing evidence preservation and export; c. Plaintiff's authorized role as lawful custodian and administrator; d. the significance of audit logs, retention settings, and export capability to evidentiary integrity; and/or e. the politically sensitive context and retaliatory motive driving Defendants' actions.

176.    Defendants refused to meaningfully consider exculpatory information and technical context demonstrating that Plaintiff's conduct was policy-consistent, custodially appropriate, and undertaken to preserve evidentiary integrity.

177.    A process that forecloses presentation of the core defense to the true charge is not constitutionally meaningful.

**Predetermined Outcome and Biased Decisionmakers**

178.    Upon information and belief, the disciplinary process was predetermined. Defendants had already decided Plaintiff must be removed because of what he knew, what he controlled, and what he refused to do in connection with politically sensitive electronic evidence.

179.     The investigation functioned to justify termination rather than to discover the truth. Decisionmakers involved in Plaintiff's discipline were themselves implicated in, beneficiaries of, and/or aligned with the containment strategy surrounding the Mayor-related incident and evidence handling, and therefore were not neutral or detached adjudicators.

180.     A hearing before biased or interested decisionmakers does not satisfy due process.

### Use of Distorted and Pretextual Charges

181.     Defendants relied on distorted descriptions of technical conduct, stripped of critical system architecture and authority context, and divorced from Plaintiff's lawful administrative role and custodial responsibilities.

182.     Defendants selectively omitted or minimized policies and practices that authorized Plaintiff's actions and did not identify any instance in which Plaintiff destroyed records, falsified data, exceeded his authority, or violated written policy. Due process does not permit termination based on manufactured, misleading, or knowingly distorted charges.

### Failure of Pre-Deprivation Process

183.     Plaintiff was entitled, at minimum, to pre-termination notice of charges, an explanation of the evidence, and a meaningful opportunity to respond. *Loudermill*, 470 U.S. at 546.

184.     Plaintiff did not receive constitutionally adequate pre-deprivation process because: (a) the true charge was concealed; (b) exculpatory evidence and technical context were ignored; (c) decisionmakers were biased; and (d) the outcome was predetermined.

185.     Because termination was foreseeable and deliberate and flowed from established decisionmaking rather than random and unauthorized acts, meaningful pre-deprivation process was required and could not be excused.

### Inadequacy of Post-Deprivation Remedies

186.    Any post-termination procedures offered by Defendants were inadequate to cure the

constitutional violations, because Defendants controlled the evidence, narrative, witnesses,

and decisionmakers, and Plaintiff was not provided a fair mechanism to adjudicate the true

basis for termination.

187.    Where the deprivation results from established procedures and decisions of final

policymakers, after-the-fact remedies do not satisfy due process.

**Causation and Constitutional Violation**

188.    Plaintiff's protected custodial conduct and refusal to compromise evidentiary

integrity was a substantial and motivating cause of the deprivation of his property interests.

Defendants' concealment of the true charge, manipulation of process, and predetermined

discipline directly caused Plaintiff's termination without due process.

189.    Defendants, acting under color of state law, deprived Plaintiff of constitutionally

protected property interests without due process of law in violation of the Fourteenth

Amendment, actionable under 42 U.S.C. § 1983.

**Third Claim for Relief:**
**Fourteenth Amendment – Stigma-Plus (42 U.S.C. § 1983)**
**(Against All Defendants)**

190.    Plaintiff incorporates by reference and realleges each and every allegation contained

in the preceding paragraphs of this Complaint as if fully set forth herein.

191.    In connection with Plaintiff's investigation, discipline, and termination, Defendants

made, adopted, ratified, and/or caused to be recorded false and stigmatizing statements of

fact concerning Plaintiff's honesty, integrity, competence, and fitness for public employment.

192.    These stigmatizing statements included, inter alia, assertions and implications that

Plaintiff: a. engaged in "misconduct" or improper conduct in administering Town security

systems and municipal electronic records; b. acted unlawfully, unethically, or in bad faith

with respect to Town surveillance footage, access-control logs, alarm data, audit logs, and related digital evidence; c. misused administrator credentials, exceeded his authority, or violated Town policy or security protocols; d. obstructed management, was insubordinate, or could not be trusted with custodial responsibility over the Town's digital infrastructure; and/or e. was professionally unfit to continue serving as the Town's Director of Innovation and Technology.

193.     The foregoing statements and accusations were materially false and misleading. Plaintiff did not destroy records, falsify data, exceed his custodial authority, or violate written Town policy. To the contrary, Plaintiff acted in good faith to preserve municipal electronic records and to maintain the integrity, retention, auditability, and lawful exportability of electronic evidence consistent with Town policy and lawful process.

194.     The stigmatizing statements were made in conjunction with Plaintiff's termination and did not constitute mere criticism of job performance. They accused Plaintiff of serious wrongdoing and unfitness in a role requiring public trust and responsibility for municipal security systems, digital records, and evidence integrity, thereby substantially impairing Plaintiff's standing in the community and foreclosing Plaintiff's ability to obtain comparable employment.

195.     Defendants published these stigmatizing accusations and/or made their disclosure to third parties likely by communicating them to Town officials and departments beyond legitimate need-to-know and by placing, causing to be placed, or maintaining such accusations in Plaintiff's personnel records, disciplinary records, investigative materials, termination documentation, and/or separation records maintained by the Town.

196.     Upon information and belief, the Town's personnel and separation records containing these accusations are routinely accessed, reviewed, and/or disclosed in the

ordinary course of employment verification, reference checks, background investigations, public-employer hiring processes, and professional due diligence. Accordingly, the stigmatizing statements were made in contexts in which disclosure to future employers and professional contacts was reasonably foreseeable and likely.

197.    Defendants coupled the stigmatizing statements with a concrete and tangible alteration of Plaintiff's legal status by terminating and/or forcing Plaintiff from his public employment, resulting in loss of salary, benefits, seniority, and career status.

198.    Defendants did not provide Plaintiff with a meaningful name-clearing hearing at a meaningful time and in a meaningful manner before an impartial decisionmaker. Plaintiff was not afforded a fair opportunity to confront the stigmatizing accusations, present exculpatory evidence, rebut false narratives about his custodial authority and policy compliance, and clear his name.

199.    Defendants' failure to provide a meaningful name-clearing hearing has caused and continues to cause reputational injury, impairment of future employment opportunities, emotional distress, and other damages.

200.    By making and publishing false stigmatizing accusations in connection with Plaintiff's termination and denying Plaintiff a meaningful opportunity to clear his name, Defendants deprived Plaintiff of liberty interests protected by the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

## Fourth Claim for Relief:
## Municipal Liability (Monell) – 42 U.S.C. § 1983
## (Against Town of Mooresville)

201.    Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

202.    Defendant Town of Mooresville is a "person" within the meaning of 42 U.S.C. §

1983 and is responsible for constitutional violations caused by (a) official municipal policies,

(b) longstanding customs or practices, (c) decisions of final policymakers, (d) ratification by

final policymakers, and (e) deliberate indifference reflected in failures to train, supervise, and

discipline.

203.    Plaintiff's constitutional injuries were caused by, and were the direct and proximate

result of, official policies, customs, and practices of the Town of Mooresville, including but

not limited to: a. a custom and practice of suppressing, containing, restricting, or tightly

controlling politically embarrassing electronic evidence rather than ensuring neutral

preservation, auditability, and lawful handling; b. a custom and practice of centralizing

control over sensitive surveillance footage, access-control records, alarm data, and audit trails

in politically accountable leadership rather than maintaining independent custodianship by

neutral technical professionals; c. a custom and practice of treating leadership-implicating

incidents as "false alarms," "non-events," or administrative issues, and declining meaningful

inquiry or ordinary investigative documentation; d. a custom and practice of retaliating

against IT personnel, records custodians, and other employees who insist upon evidentiary

integrity, retention, auditability, and lawful retrievability/exportability of municipal electronic

records; e. a custom and practice of using pretextual discipline, internal investigations, and

administrative processes as tools to neutralize or remove employees who create evidentiary

risk for Town leadership; f. a custom and practice of protecting politically connected officials

from scrutiny while targeting whistleblowers and custodians; and g. a custom and practice of

publicly pledging transparency and promising release of records or investigative materials in

response to community concern, while simultaneously withholding, narrowing, or limiting

production of the surveillance footage, CAD entries, alarm logs, and audit trails at issue here,

thereby demonstrating that the Town's commitment to openness was selective and politically motivated.

204.    These customs and practices were not isolated incidents. Upon information and belief, they were widespread, longstanding, and known within Town operations, as evidenced by: a. the retaliatory treatment and termination of Plaintiff after he insisted on preserving and lawfully handling Mayor-related surveillance footage and associated records; b. the Town's similar retaliation against former Town IT employee Jeffrey Noble after he reported the same Mayor-related Town Hall footage and related evidence-handling concerns; c. the Town's similar retaliation against former Assistant Chief of Police Frank Falzone after he raised concerns regarding evidence integrity and politically sensitive incidents involving Town leadership; and d. the Town's recurring institutional response of attacking or removing the custodian rather than pursuing meaningful inquiry into the underlying incident or evidence handling.

205.    Final municipal policymakers, including the Town Manager and the Chief of Police (who also held an additional executive role within Town management), possessed final authority and/or final decisionmaking control over discipline, termination, incident characterization, internal investigative routing, and evidence-handling governance, and they personally participated in, directed, approved, and/or ratified the actions taken against Plaintiff.

206.    The Town Manager exercised final policymaking authority with respect to Plaintiff's termination and ratified the retaliatory basis for Plaintiff's removal by approving discipline grounded in pretextual allegations while being aware of Plaintiff's protected conduct and the evidence-integrity dispute at the center of this case.

207.     The Chief of Police exercised final decisionmaking authority over incident characterization and investigative routing for the Mayor-related Town Hall security event, participated in and/or approved the decision to minimize that incident as a "false alarm" or its equivalent without meaningful inquiry, and supported actions restricting scrutiny and targeting custodians of the underlying electronic records.

208.     The Town, through its final policymakers, knowingly chose to adopt and enforce a narrative that reframed Plaintiff's lawful custodial conduct as "performance" or "judgment" failures and used that narrative to justify discipline and termination, thereby ratifying unconstitutional retaliation and converting it into official municipal action.

209.     Alternatively and independently, the Town is liable under *Monell* because it failed to adequately train, supervise, and discipline officials and supervisors regarding: a. constitutional limits on retaliatory discipline for protected speech and refusals to engage in wrongdoing; b. lawful preservation and handling of municipal electronic records and evidence, including retention, auditability, and exportability; c. neutral custodianship and segregation of politically sensitive evidence-handling decisions from conflicted decisionmakers; and d. the requirement that adverse employment actions not be used to punish employees for insisting on evidentiary integrity and truthful handling of electronic records.

210.     The need for training and supervision in these areas was obvious. The Town relies extensively on digital surveillance systems, access-control infrastructure, alarm monitoring, and electronic audit logs for public safety, accountability, and governance. The predictable consequence of failing to train and supervise decisionmakers and managers in these areas is the misuse of administrative power to suppress evidence integrity concerns and retaliate against custodians and whistleblowers.

211.     The Town's failures to train, supervise, and discipline reflected deliberate

indifference to the constitutional rights of employees tasked with maintaining and

safeguarding municipal electronic evidence. As a result, Town officials and employees

reasonably understood that politically sensitive evidence could be tightly controlled, that

custodians who insisted on integrity could be punished through administrative process, and

that such retaliation would carry no meaningful consequences.

212.     The Town's policies, customs, practices, ratification by final policymakers, and/or

failures to train and supervise were the moving force behind the deprivation of Plaintiff's

First and Fourteenth Amendment rights.

213.     But for these municipal policies and customs, Plaintiff would not have been

subjected to retaliatory discipline, pretextual investigation, and termination. Defendant Town

of Mooresville is therefore liable to Plaintiff for all damages caused by the constitutional

violations described herein pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social

Services, 436 U.S. 658 (1978).

### Fifth Claim for Relief:
### Civil Conspiracy (42 U.S.C. § 1983)
### (Against All Individual Defendants)

214.     Plaintiff incorporates by reference and realleges each and every allegation contained

in the preceding paragraphs of this Complaint as if fully set forth herein.

215.     At all relevant times, Defendants reached and participated in a concerted agreement,

understanding, and course of conduct to deprive Plaintiff of rights secured by the First and

Fourteenth Amendments and to accomplish unlawful objectives under color of state law,

including: a. suppressing, restricting, concealing, misclassifying, and controlling politically

damaging electronic evidence and related auditability/exportability; b. foreclosing

meaningful inquiry into the Mayor's after-hours entry into Town Hall and insulating the

incident from ordinary accountability mechanisms; and c. retaliating against Plaintiff for refusing to participate in such suppression and for insisting on preservation, auditability, and lawful handling of electronic records.

216.    The conspiracy was motivated by Defendants' shared interest in protecting Town leadership, avoiding political and institutional fallout, maintaining control over sensitive digital evidence, and preventing the existence of an auditable trail that would reveal how the evidence was accessed, handled, exported, or restricted.

217.    Defendants knowingly agreed that Plaintiff, as the senior custodian and administrator with technical access and institutional knowledge of the Town's surveillance and electronic-records environment, posed a threat to continued concealment and containment and therefore needed to be neutralized, marginalized, and removed.

218.    In furtherance of the conspiracy, Defendants committed overt acts, including but not limited to: a. minimizing and characterizing the Mayor-related incident as a "false alarm" or its equivalent without meaningful inquiry; b. reviewing, discussing, and controlling access to the surveillance footage and related logs while restricting Plaintiff's ability to preserve auditability, maintain export capability through established channels, and support lawful production; c. directing or pressuring Plaintiff to treat the Mayor-related footage differently from standard municipal security records and evidence-handling channels; d. isolating Plaintiff from decision-making, staff, and information within his portfolio; e. stripping Plaintiff of authority and responsibilities and undermining his custodial role; f. initiating and escalating pretextual disciplinary and investigative processes; g. mischaracterizing Plaintiff's lawful custodial conduct as misconduct or insubordination; h. coordinating use of the Town's HR and disciplinary apparatus to manufacture a paper trail of pretextual performance or "judgment" issues; i. circulating stigmatizing accusations about Plaintiff and

placing such accusations in personnel or separation records; j. escalating pressure on Plaintiff to resign or retire; and k. terminating and/or forcing Plaintiff from employment.

219.    Each Defendant knew the essential nature of the plan and knowingly participated in the conspiracy by committing at least one overt act in furtherance thereof.

220.    Defendants' concerted actions were taken under color of state law and were intended to deprive Plaintiff of rights secured by the First and Fourteenth Amendments, including the right to be free from retaliation for protected speech and refusals to engage in wrongdoing, the right to procedural due process, and the right to a meaningful opportunity to clear his name.

221.    Defendants' conspiracy was a proximate cause of Plaintiff's termination, reputational harm, emotional distress, and economic losses.

222.    But for Defendants' agreement and coordinated actions, Plaintiff would not have been subjected to retaliatory discipline, pretextual process, and termination.

223.    As a direct and proximate result of Defendants' unlawful conspiracy, Plaintiff suffered damages including loss of employment, loss of income and benefits, emotional distress, damage to professional reputation, and other compensable injuries. Defendants are jointly and severally liable for all damages caused by the conspiracy pursuant to 42 U.S.C. § 1983.

### Sixth Claim for Relief:
### Declaratory and Injunctive Relief
### (42 U.S.C. § 1983; 28 U.S.C. §§ 2201-2202)

224.    Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

225.    An actual, present, and justiciable controversy exists between Plaintiff and Defendants concerning Defendants' past and ongoing practices of suppressing, restricting,

misclassifying, and controlling access to politically sensitive municipal electronic records, and retaliating against custodians who insist upon preservation, auditability, and lawful handling of such records.

226.    Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 declaring that the acts, omissions, policies, customs, and practices described in this Complaint violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, including Plaintiff's rights to be free from retaliation for protected activity, to due process before termination, and to a meaningful name-clearing opportunity where stigmatizing accusations were made in connection with termination.

227.    Plaintiff further seeks prospective injunctive relief, tailored to prevent ongoing and future irreparable harm, to preserve evidence, and to provide meaningful redress that cannot be fully remedied by damages alone.

228.    Specifically, Plaintiff seeks an order requiring Defendants to preserve, maintain, and not destroy, alter, overwrite, or render inaccessible the following categories of electronically stored information and related audit artifacts, to the extent within Defendants' custody, control, or practical ability to preserve: a. all Town Hall CCTV video, archived footage, exports, and associated video files relating to the October 2024 after-hours Town Hall incident; b. access-control/swipe-card records and credential logs reflecting entry, door events, and related authentication activity for the relevant time periods; c. alarm, motion-detection, and monitoring records, including time-stamped triggers, alerts, and event logs; d. police dispatch and response records relating to the Town Hall alarm/motion events, including CAD entries and related incident documentation; e. system audit logs and administrative logs for the CCTV and related security platforms reflecting user access, viewing, exports, configuration changes, retention changes, deletions, and permission

changes; and f. backups, retention repositories, and disaster-recovery copies reasonably likely to contain any of the foregoing data and metadata.

229.     Plaintiff seeks an order prohibiting Defendants from engaging in further suppression-by-technical-means of the foregoing evidence categories, including disabling export functionality, altering retention settings to accelerate deletion, restricting audit logging, or manipulating permissions in a manner intended to defeat auditability or lawful production.

230.     Plaintiff seeks an order requiring Defendants to preserve and maintain system audit logging and retention settings for the foregoing evidence categories during the pendency of this action and to implement reasonable, narrowly tailored litigation-hold measures sufficient to prevent spoliation or loss.

231.     Plaintiff seeks an order requiring Defendants to provide Plaintiff with a prompt and meaningful name-clearing hearing before a neutral decisionmaker, at which Plaintiff may respond to the stigmatizing accusations made in connection with his termination and present evidence that his custodial conduct was policy-consistent and undertaken in good faith to preserve evidentiary integrity.

232.     Plaintiff seeks an order requiring correction, expungement, sealing, and/or appropriate annotation of adverse personnel and separation records to the extent they contain false stigmatizing statements of fact concerning Plaintiff's honesty, integrity, competence, or fitness for public employment, together with an order prohibiting further dissemination of such false stigmatizing statements without a lawful basis.

233.     Plaintiff seeks an order prohibiting Defendants from taking further retaliatory action against Plaintiff for pursuing this litigation and/or engaging in constitutionally protected

activity, including communications that would unlawfully interfere with Plaintiff's ability to obtain employment or clear his professional reputation.

234.    Plaintiff seeks such other and further declaratory and prospective injunctive relief as the Court deems just and proper to remedy ongoing constitutional injuries and prevent future violations.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

1. Declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 declaring that Defendants' acts, omissions, policies, customs, and practices described in this Complaint violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

2. Compensatory damages against Defendants, jointly and severally as applicable, in an amount to be determined by a jury, including but not limited to back pay, lost wages, lost benefits, loss of earning capacity, front pay in lieu of reinstatement (or, in the alternative, reinstatement where appropriate), loss of retirement-related benefits, emotional distress, mental anguish, humiliation, and reputational harm;

3. Punitive damages against the individual Defendants, in their individual capacities, in an amount to be determined by a jury, for willful, malicious, and/or reckless disregard of Plaintiff's federally protected rights;

4. Injunctive and equitable relief as authorized by 42 U.S.C. § 1983 and the Court's inherent equitable powers, including as appropriate: a. a prompt and meaningful name-clearing hearing before a neutral decisionmaker; b. correction, expungement, sealing, and/or appropriate annotation of personnel and separation records to the extent they contain false stigmatizing statements of fact concerning Plaintiff; c. an order requiring preservation of the

surveillance footage, logs, metadata, audit logs, retention repositories, and related

electronically stored information described in this Complaint, and prohibiting alteration,

deletion, overwriting, suppression-by-technical-means, or spoliation; and d. an order

prohibiting retaliatory conduct or unlawful interference with Plaintiff's efforts to obtain

employment or clear his professional reputation;

5. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable federal law;

6. Pre-judgment and post-judgment interest as allowed by law;

7. Trial by jury on all issues so triable; and

8. Such other and further relief as the Court deems just and proper.

Dated: March 4, 2026

/s C. Christopher Adkins
C. Christopher Adkins
N.C. Bar No. 46950
Adkins Law, PLLC
9620 Sherrill Estates Road
Huntersville, North Carolina 28078
Phone: (704) 274-5677
Fax: (877) 208-7577
chris@huntersvillelawyer.com

/s Christerfer R. Purkey
N.C. Bar No. 53584
Rech Law, P.C.
18125 W. Catawba Avenue
Cornelius, North Carolina 28031
(704) 228-2790 phone
(704) 909-7410 fax
cpurkey@rechlaw.com
*Admission in W.D.N.C. pending

*Counsel for Plaintiff*

*** Verification Page to Follow ***

## VERIFICATION

I, **Christopher Lee**, being duly sworn, state that I have read the foregoing Complaint and know the contents thereof; that the factual allegations stated therein are true and correct to the best of my knowledge, information, and belief; and that the matters stated upon information and belief are believed by me to be true.

This _3_ day of March, 2026.

_Christopher Lee_ (signature)

**Christopher Lee**

STATE OF NORTH CAROLINA
COUNTY OF _Mecklenburg_

Subscribed and sworn to (or affirmed) before me this _3rd_ day of March, 2026, by **Christopher Lee**, who is personally known to me or has produced _drivers license_ as identification.

Notary Public Name: _Charles Christopher Adkins_

Notary Public Signature: _(signature)_

My Commission Expires: _August 16, 2028_

[Notary Seal]